**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

JANNA HALL,

        Plaintiff,

v.

KENNY HABUL,

        Defendant.

**CIVIL ACTION NO. 3:13-cv-00406**
**JUDGE SHELLY D. DICK**
**MAG. JUDGE R.L. BOURGEOIS, JR.**

# DEFENDANT'S TRIAL BRIEF

7582185

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 2

   A.  The Sanctuary Cove 1 Project ................................................................................ 2

   B.  The Sanctuary Cove 2 Project ................................................................................ 5

   C.  The Cornelius Project ............................................................................................ 8

   D.  The Personal Loans .............................................................................................. 10

   E.  Total Transactions ............................................................................................... 10

ARGUMENT ..................................................................................................................... 11

   A.  Hall is not Entitled to an Accounting because She and Habul Developed Three
       Independent Projects and did not Form an "Overall Joint Venture." ................. 11

   B.  Even if Hall and Habul Formed an "Overall Joint Venture," Legal and Equitable Barriers
       Still Prevent the Accounting Hall Seeks. ............................................................ 15

   C.  When Analyzed Separately, Legal and Equitable Principles Prevent Hall from Obtaining
       an Accounting for Each of the Three Independent Real Estate Projects. ........... 17

     1.  Hall is not entitled to an accounting for the Sanctuary Cove 1 Project. ..................... 17

       i.  Australia's six-year statute of limitations bars Hall's accounting claim for her
          contributions to the Sanctuary Cove 1 Project. ......................................................... 17

       ii.  Habul does not owe Hall a fiduciary duty to account because Group Three Australia,
          not Habul, was Hall's partner in the Sanctuary Cove 1 Project. ................................ 18

     2.  Hall is Not Entitled to an Accounting for the Sanctuary Cove 2 Project. .................. 20

       i.  Australian corporate law, which governs claims arising out of disputes between the
          shareholders in Louisiana Developments, prevents Hall from obtaining an accounting
          from Habul. .................................................................................................................. 20

       ii.  Hall is also barred from obtaining an additional accounting for the Sanctuary Cove 2
          Project because she has already received a full accounting of the project's profits and
          losses from WMS. ...................................................................................................... 21

     3.  Granting Hall an Accounting for any of the Three Independent Real Estate Projects
       Would Also be Inequitable. ....................................................................................... 22

   D.  Hall has no Right to an Accounting for Her Personal Loans to Habul. ............................ 25

     CONCLUSION ................................................................................................................. 26

## INTRODUCTION

The issue in dispute at this point of Plaintiff Janna Hall's case against Defendant Kenny Habul is whether Hall can impose upon Habul the obligation to sift through the financial records of three independent, long finished or dormant real-estate projects—two luxury home projects in Australia and a commercial development in North Carolina—and confirm that Habul owes Hall no money. To resolve this issue, the Court has indicated that the answer "is dependent on the existence of [an] overall joint venture." (Docket # 73.)

The facts developed in discovery and that will be proven at trial demonstrate that Hall and Habul pursued three separate real estate projects over the course of a decade, using different organizational forms, pursuing different goals, and using different sources of funding. The separate nature of the projects proves conclusively that Hall and Habul did not create—and under Louisiana contract law could not have created—a single, wide-ranging, undocumented "overall joint venture" in Habul's "ideas."

Moreover, Hall's demand for an accounting faces another fatal flaw that even her alleged "overall joint venture" theory cannot save. Hall acknowledges that after two years of litigation she cannot demonstrate that Habul breached any fiduciary duty owed to her. This admission is absolutely fatal to any claim for a partnership/joint venture accounting regardless of the scope of the partnership/joint venture because a breach is a necessary precondition to any partnership accounting under Louisiana law.

Hall has also presented no legal theory for how her accounting claim can survive when her three projects are viewed separately. Indeed, Hall has no basis to demand an accounting when the record reflects that her claims regarding her first project in Australia are barred by the statute of limitations and the fact that Habul was not Hall's partner in the project; her claims regarding the second project in Australia fail because Australian corporate law does not require

the accounting Hall seeks and Hall has already received the accounting to which she claims entitlement; and her claims regarding all three projects are undermined by the fact that she and Habul had equal access to each project's records and discovery reveals that each dollar Hall contributed was used as intended.

Hall's demand for an accounting for money she loaned to Habul for his personal expenses is similarly a non-starter whether or not she and Habul formed an "overall joint venture." Louisiana law provides that debtors do not owe creditors a fiduciary duty to account for loaned funds. In addition, discovery revealed that Habul has overpaid Hall on her personal loans in the amount of $17,100, making any accounting for the loaned funds inequitable and unnecessary.

Therefore, Hall is not entitled to the sweeping accounting she seeks, and Habul respectfully requests that the Court deny Hall's demand for an accounting.

## FACTUAL BACKGROUND

Hall and Habul became friends while traveling in 2001. (Hall Aff. (Docket # 49-3) ¶ 3; Habul Aff. (Docket # 59-9) ¶ 3.) At the time, Habul was developing luxury homes in a resort neighborhood in Australia through Group Three Holdings Pty Ltd. ("Group Three Australia"), an Australian company Habul owned with another individual. Habul's real estate development work interested Hall. (Habul Aff. ¶¶ 2-3; Hall Aff. ¶ 4.)

### A.     *The Sanctuary Cove 1 Project*

Within a year of their initial meeting, Hall and Habul first discussed the "idea that [Hall] partner with [Habul] in the building of *a luxury home*" in an Australian resort neighborhood known as Sanctuary Cove (the "Sanctuary Cove 1 Project"). (Hall Aff. ¶ 6 (emphasis added).) Hall "verbally committed" to the project (Hall Dep. (Docket # 59-11 to 17) at 49-50), and she and Habul regularly "discuss[ed] the logistics of establishing [their] new venture" and "buil[t]

[their] business relationship" (Hall Aff. ¶ 7). The Sanctuary Cove 1 Project was the only project Hall and Habul discussed and pursued at this time.

After agreeing to participate in construction of the luxury home, Hall traveled to Australia to view the proposed location for the house. (Hall Dep. at 49-50.) During her trip, she engaged Rodney Johanson, an Australian attorney, to prepare a Joint Venture Agreement for the luxury home project. (Hall Dep. 59-61; Hall Dep. Ex. 1; Johanson Aff. (Docket # 59-10) ¶ 5.; Habul Aff. ¶ 5-6.) The purpose of the Agreement was "to document the terms of [the] business arrangement for the building of the first property at Sanctuary Cove." (Hall Dep. 60-61.)

The JV Agreement that Johanson drafted was between Hall and Group Three Australia. (Johanson Aff. ¶ 5.; Habul Aff. ¶ 5-6; Hall Dep. 62-63.) The JV Agreement provided that Hall and Group Three Australia would each own fifty percent (50%) of the venture. (Hall Dep. Ex. 1 at 9.) Habul was not a party to the contract. (Hall Dep. at 66.) In addition, the JV Agreement specified that Hall would serve as the Manager of the joint venture, that the parties did <u>not</u> intend to form a partnership, and that third-party accountants would be retained to calculate the profit or loss of the business. (Hall Dep. at 58-59, 67-71, 77-79; Hall Dep. Ex. 1.) The JV Agreement also provided that the venture would terminate upon completion of the Sanctuary Cove 1 Project. (Hall Dep. Ex. 1.)

Pursuant to her authority under the JV Agreement, Hall purchased Lot 76 in the Sanctuary Cove development for $300,000 (AUD) in her own name in 2003. (Johanson Aff. ¶ 7; Hall Dep. at 91-92.) She engaged Johanson to serve as her attorney for this transaction. (Hall Dep. at 95-96.) Hall obtained a loan of $480,000 (AUD) from Australia and New Zealand Banking Group Limited ("ANZ") to fund construction of the residence. (Hall Dep. at 93-94; Hall Dep. Ex. 4; Hall Aff. ¶ 9; Habul Aff. ¶ 4; Johanson Aff. ¶ 7.) Pursuant to her duties as Manager,

Hall also established a bank account in Australia to pay vendors and suppliers from the loan proceeds. (Hall Dep. at 101-03; Hall Aff. ¶¶ 8-9; Habul Aff. ¶ 11.) As required by the JV Agreement, an Australian accounting firm, Pennell Kerr Foster ("PKF Accountants"), was retained to perform tax and accounting services for the Sanctuary Cove 1 Project. (Habul Aff. ¶ 10; Hall Dep. at 77-79.) Hall also retained Group Three Australia to serve as the project's contractor. (Hall Dep. Ex. 2.)

After the Sanctuary Cove 1 Project was completed, Hall again retained Johanson to serve as her counsel for the sale of the home. (Hall Dep. at 114-15; Hall Dep. Ex. 10; Johanson Aff. ¶ 8.) The luxury home sold in 2005 for $1,512,500 (AUD). (Hall Dep. at 111-12.) PKF Accountants performed accounting services for the Sanctuary Cove 1 Project, including a calculation of the project's profits and losses. The project earned a profit (Hall Dep. at 31-32), and when neither Hall nor Habul raised questions about PKF Accountants' calculations, the firm destroyed its records related to the project in accordance with the firm's document-retention policy. (Habul Aff. ¶ 53.)

There is no dispute that, at the time of the sale, and in the years following, Hall never suggested to Habul that she lacked sufficient information about the project. (Habul Aff. ¶ 17; Hall Dep. at 124.) As the owner of the lot, the manager of the business enterprise, the borrower on the loan, and the owner of the bank accounts, Hall had full access to the business and financial information and records related to the Sanctuary Cove 1 Project. (Habul Aff. ¶ 14; *see* Hall dep. at 123-25.) Hall has acknowledged, for example, that her attorney, Rodney Johanson, communicated directly with her in Baton Rouge about the development and sent her the transaction documents. (Hall Dep. at 95-98, 114-19, 121-23; Hall Dep. Exs. 5, 10-13; Johanson Aff. ¶ 9.) She received statements from her bank for the account she set up at National Australia

Bank ("NAB") in Australia. (Hall Dep. at 101-07; Hall Dep. Exs. 6-7; Habul Aff. ¶ 11.) In fact, when the bank apparently had the wrong address for her, Hall contacted her representative at NAB to make sure that the bank sent statements to her home in Baton Rouge. (Hall Dep. at 103-07; Hall Dep. Ex. 7.)

If Hall did not receive or review financial information related to this project, it "was a choice" because she "hate[s] dealing with that stuff." (Hall Dep. at 143.) As she admits, she could have accessed her bank statements any time through the internet, but chose not to do so. (*Id.* at 101-07; Hall Dep. Exs. 6-7.) Hall also concedes that she could seek more information from the various parties involved, such as her attorney, the accountants, and the bank. Nonetheless, she admits that she never suggested to Habul or any of the professionals she engaged that she wanted more information about the project.[1] (Hall Dep. at 123-25.) As Hall has testified, rather than asking for more information about the project or expressing dissatisfaction with her business dealings with Group Three Australia and Habul, Hall was pleased with the outcome and chose to undertake a second, independent project at the same resort. (*Id.*)

**B.    *The Sanctuary Cove 2 Project***

After the Sanctuary Cove 1 Project sold in 2005, Hall and Habul discussed "repeating" their first project in "a new section of Sanctuary Cove" that "had become available for development" (the "Sanctuary Cove 2 Project"). (Hall Aff. ¶ 16.) In the spring of 2005, Hall and

---

[1] On the rare occasion that she asked for records from the professionals associated with the Sanctuary Cove 1 Project, she received them. In 2006, Hall's U.S. accountant, Pam Frye, obtained extensive information from the Australian accountant, Matt Butler, about the project so that Frye could prepare Hall's tax returns. Hall delegated that task to Frye, and Frye obtained the information she needed. Hall acknowledged that her accountant could have obtained any additional information if she needed it. (Hall Dep. at 131-41; Hall Dep. Ex. 14)

Similarly, it is undisputed that Hall did not request further information from her lawyer, Johanson, about the purchase or sale of the Sanctuary Cove 1 Project until the summer of 2013. (Johanson Aff. ¶ 18.) She did so because she had lost documents previously sent to her when a bathtub overflowed. (Hall Dep. at 339-40.) Likewise, Hall did not reach out to the accounting firm, PKF, for its accounting records until discovery commenced in this lawsuit. PKF produced documents to her, but had already destroyed its records in accordance with its document retention policy. (Hall Dep. at 142-44; Hall Dep. Ex. 15; Habul Aff. ¶ 53.)

Habul formed Louisiana Developments Pty Ltd. ("Louisiana Developments"), an Australian corporation in which Hall and Habul each owned fifty percent, to develop the project. (Johanson Aff. ¶ 11; Hall Dep. at 145-48; Hall Aff. ¶ 17.) Hall and Habul also agreed to repeat the terms of the business relationship from the Sanctuary Cove 1 Project as set forth in the JV Agreement, including that Group Three Australia would be engaged as the contractor and third-party accountants would determine the enterprise's profits or losses. (Hall Dep. at 34, 149; Habul Aff. ¶¶ 21, 23; Hall Aff. ¶ 16 (explaining that Hall and Habul planned to repeat their original business venture).)

Hall contributed her proceeds from the Sanctuary Cove 1 Project to Louisiana Developments. Louisiana Developments obtained a loan from ANZ and purchased the Sanctuary Cove 2 lot on March 17, 2006, for $530,000 (AUD). (Hall Dep. at 152, 161-62; Hall Dep. Ex. 18; Habul Aff. ¶ 24.) With Hall's full knowledge, the company retained Johanson to serve as counsel on the purchase and sale of the property and engaged an accounting firm, WMS, as the accountants for the project. (Hall Dep. at 149-50; Hall Dep. Ex. 16; Lavell Dep. (Docket # 110-1) at 17.) Over the next two years, Louisiana Developments built the luxury home as planned. Unfortunately, the Australian luxury home real-estate market experienced a significant downturn during that time. (Johanson Aff. ¶ 15; Hall Dep. at 202-03.)

In 2007, a dispute arose with ANZ, and the lender threatened to foreclose on the property. (Hall Dep. at 171-75.) Hall was heavily involved in dealing with this financial emergency. Identifying herself as "the major shareholder of Louisiana Developments," she wrote to ANZ objecting to its position and flew from Louisiana to Australia to meet with the bankers. While there, she engaged a law firm to assist in negotiations and eventually entered into an agreement with ANZ on behalf of Louisiana Developments, resolving the issue by obtaining more time to

sell the property and pay off the loan. (Hall Dep. at 188-93, 198-200; Hall Dep. Exs. 21-24.)

Ultimately, Louisiana Developments sold the Sanctuary Cove 2 Project in May 2008 for $1,915,000 (AUD)—far less than Hall and Habul had planned. (Habul Aff. ¶¶ 28-29; Johanson Aff. ¶ 16; Hall Dep. at 210-11.) Louisiana Developments used the bulk of the sale proceeds to repay a $1,318,504 (AUD) mortgage on the property. (Hall Dep. at 211; Johanson Aff. ¶ 16.) Louisiana Developments also distributed $399,980 (US) / $426,383 (AUD) to Hall (Hall Dep. at 213-14; Habul Aff. ¶ 29), and $170,000 (AUD) to Habul (Lavell Dep. at 24). At the time of the distributions, Louisiana Developments owed substantial taxes related to the sale of the luxury home, payments on a loan from Habul's father, and had other outstanding bills. (Habul Aff. ¶ 29.) As a result, Louisiana Developments was unable to pay WMS to perform a full accounting of profits and losses for the Sanctuary Cove 2 Project.

In or around 2011, Habul contacted Johanson and WMS to determine which of Louisiana Developments' liabilities remained unpaid. He then settled many of the outstanding bills with his own money. (Habul Aff. ¶ 32.) During this litigation, Habul also paid $20,000 to WMS for the firm to complete the accounting for the Sanctuary Cove 2 Project. The accounting, which WMS completed in April 2015, determined that the project resulted in a profit of $68,813 (AUD). (Lavell Dep. at 48-49.) However, the distributions to Habul and Hall in 2008 exceeded the shareholders' loan accounts with Louisiana Developments meaning both shareholders currently *owe money* to Louisiana Developments. (Lavell Dep. at 53; *id.* Ex. 94 (Docket # 115-1) at 10.)

As with the Sanctuary Cove 1 Project, Hall had access to the corporation's business and financial information, bank accounts, and records related to the purchase and sale of the Sanctuary Cove 2 Project. (Habul Aff. ¶ 33.) For example, the company's attorney, Johanson, sent records relating to the purchase and subsequent sale of the property, including the contracts,

settlement statements, and other financial documents. (Hall Dep. at 151-55, 163-67; Hall Dep. Exs. 18-20 (purchase documents); *id*. at 206-14; Hall Dep. Exs. 25-27 (sale documents).) She also received bank statements for Louisiana Developments' account with NAB. (Hall Dep. at 224.) In addition, Hall and her personal accountant, Pam Frye, had and continue to have full access to WMS. (*See, e.g.*, Lavell Dep. at 57-58.)

If Hall did not receive or review information about the Sanctuary Cove 2 Project, she admits it was by her own choice. As she concedes, she never asked for additional records or information about the project from Johanson, WMS, NAB, or ANZ. (Hall Dep. at 201-02, 210-11, 213, 216-17, 223, 225; Johanson Aff. ¶ 18.)[2] Although she understood that the bank statements would have kept her apprised of payments and other financial activity, she did not request them from the bank or attempt access via the bank's internet site. (Hall Dep. at 223-28; Hall Dep. Ex. 30.) Hall, of course, accepted the distribution she received at the end of the project and, at the time of the sale and in the years following, never suggested to Habul that she lacked information about the project. (Habul Aff. ¶¶ 29, 34; Hall Aff. ¶ 34; Hall Dep. at 216-17.)

## C.    *The Cornelius Project*

During the development of the Sanctuary Cove 2 Project, Habul moved from Australia to the United States. He began developing plans for a commercial real estate project in North Carolina. (Habul Aff. ¶ 35.) Habul proposed building a retirement community and an energy-efficient office building on approximately 10 acres of land in Cornelius, North Carolina (the "Cornelius Project"). (Hall Dep. 34-35.) Hall was "interested in being involved in th[e] project." (Hall Dep. at 236.) Habul agreed to allow Hall to participate. (Habul Aff. ¶ 27.)

---

[2] Hall testified that she received 2006 and 2007 financial statements for Louisiana Developments from the accountants by simply asking for them . (Hall Dep. at 219-22; Hall Dep. Exs. 28-29.) She could have, but did not, request them during the prior seven years and did not ask any follow-up questions when she got the records. (Hall Dep. at 222-23.)

In July 2007, Hall and Habul formed Lake Norman Retirement Communities, LLC, a North Carolina limited liability company, to pursue the project. (Hall Dep. at 236; Habul Aff. ¶ 38.) They agreed that Habul would have an eighty percent (80%) interest in the enterprise and Hall would own the remaining twenty percent (20%). (Habul Aff. ¶ 38.) In October 2007, Group Three Holdings, LLC ("Group Three NC"), a North Carolina limited liability company of which Habul was the sole member, obtained a $1,420,000 loan from SunTrust Bank (the "First Cornelius Loan"), which Habul and Hall personally guaranteed. (Hall Dep. at 242-46; Hall Dep. Exs. 32, 34.) Group Three NC used the proceeds of the loan to purchase approximately 10 acres of property for $1,775,000 (the "First Cornelius Parcel"). (Hall Dep. at 241-42.)

Hall and Habul needed a second parcel of land adjacent to the First Cornelius Parcel to develop the property as they envisioned. Group Three NC acquired the second parcel of land (the "Second Cornelius Parcel") in early 2008 using approximately $311,000 from a loan Hall had obtained from SunTrust Bank that was secured by lakefront property she owned in North Carolina. (Hall Dep. at 250-51; Habul Aff. ¶ 42; Hall Aff. ¶ 34.)

Around that time, though, the same worldwide recession that depressed the luxury home market in Australia caused a sharp downturn in the commercial real-estate market in North Carolina. (Habul Aff. ¶ 45; Hall Dep. at 202-03, 253.) As the value of the Cornelius Project's land dropped and the availability of credit dried up, neither Hall nor Group Three NC was able to obtain financing to build the energy-efficient building or retirement community. (Habul Aff. ¶ 45.) Both Hall and Habul were also cash-strapped during the economic downturn, limiting their ability to make payments on the First and Second Cornelius Loans. Hall's final contributions to the Cornelius Project were two payments totaling $80,000 on the First Cornelius Loan on September 11, 2009. (Hall Dep. at 302.) Habul struggled to make payments on the loans into

2010, but eventually both the First and Second Cornelius Loans went into default. (Hall Dep. at 253-54; Habul Aff. ¶ 46; Hall Aff. ¶¶ 45-46.)

SunTrust initiated foreclosure proceedings, but on July 1, 2011, Habul used personal funds to pay off the Second Cornelius Loan, which saved Hall's lakefront property from foreclosure. (Habul Aff. ¶¶ 46-47.) Over the next few months, Habul also used personal funds to negotiate a reduced pay-off of the First Cornelius Loan. He paid off the First Cornelius Loan with a final payment of $876,065 on October 24, 2011. (Habul Aff. ¶ 48.)

Including the payoff of the loans, Habul has contributed at least $2.175 million to the project. Hall has contributed $222,374. (Habul Supp. Aff. ¶¶ 7-8; Hall Dep. at 262-63, 296-303; Hall Dep. Ex. 37.) Despite Hall contributing only 10% of the capital to this project, Habul acknowledges she has a 20% interest in the project. Group Three NC continues to own the undeveloped land associated with the Cornelius Project unencumbered by any debts or loans. The property remains undeveloped, and it is currently worth less than its purchase price of approximately $2.086 million. (Habul Aff. ¶ 49.) As with the Sanctuary Cove projects, Hall concedes that she never asked Habul or the accountants for additional information or documents about the Cornelius Project. (Hall Dep. at 264.)

### D.    The Personal Loans

Hall also made several interest-free loans to Habul. These personal loans totaled $320,000. Between February 2008 and August 2012, Habul transferred $337,100 to Hall to repay the personal loans—an overpayment of $17,100.

### E.    Total Transactions

In all, Hall alleges in her Complaint that she advanced $1,963,000 to Habul. In her deposition testimony, however, Hall admits that her initial calculations double counted certain contributions and also incorrectly categorized loans that Hall made as part of her "capital

contributions." Hall ultimately agreed in discovery that she advanced no more than $953,000—a number Habul now calculates at $963,374—for the Sanctuary Cove and Cornelius projects and the personal loans. Habul, meanwhile, has transferred $737,080 to Hall, including the funds she received from the three real estate projects as well as his over-repayment of the personal loans. Hall also continues to own a 20% interest in the Cornelius Project's land, which was purchased for $2.086 million and is now unencumbered by any loans or mortgages.

## ARGUMENT

**A.**      ***Hall is not Entitled to an Accounting because She and Habul Developed Three Independent Projects and did not Form an "Overall Joint Venture."***

Hall's accounting claim seeks to force Habul to "account" for what Hall nebulously alleges is a bi-continental "joint venture for the development of various investments in real estate." (Hall's Reply Brief in Support of Mot. for Sum. J. (Docket # 62) at 12.) She insists that she "invest[ed] in Kenny . . . in his vision, in his ideas of what he wanted to develop" (Hall Dep. at 35-36) and demands, on that basis, that Habul provide an accounting of all her monetary contributions to the real-estate projects and personal loans to satisfy her vague hunch that Habul owes her money. Yet Hall's attempt to clump three separate projects—projects that covered two continents, took three different organizational forms, had markedly different goals, and spanned more than a decade's time—is unsupported by the facts that will be proven at trial and the law.

As an initial matter, the facts in the record and that will be proven at trial contradict the formation of an "overall joint venture." Hall has represented to the Court that this supposed "global" venture was "confected" in early 2002 when Habul visited Hall's home in Louisiana. (Hall's Opp. to Habul's Mot. for Sum. J. (Docket # 67) at 4.) In her own affidavit, however, Hall admits that during Habul's visit in 2002, the two friends discussed only "the idea that [Hall] partner with [Habul] in the building of *a luxury home* [in Australia]." (Hall Aff. ¶ 6 (emphasis

added).) Similarly, Hall recognizes that she and Habul agreed in 2005 to repeat the terms of the Sanctuary Cove 1 Project for a second Australian luxury home (Hall Aff. ¶ 16) and, later, that she would participate in a different project in North Carolina (Hall Aff. ¶ 18). Hall has also testified that she knew Habul was involved in different projects and businesses with other partners—projects in which Hall did not participate. (Hall Dep. at 158-61; Hall's Proposed Findings of Fact (Docket # 108) ¶ 8.) These undisputed facts make clear that Hall agreed to participate in three distinct and independent projects—not a bi-continental, decade-long joint venture in all of Habul's "ideas."

Moreover, Hall's unsupported and self-serving statements that her friendship with Habul somehow formed the basis of an unwritten "overall joint venture" fail to meet her evidentiary burden of establishing the existence of a partnership/joint venture between the parties. *LaRocca v. Bailey*, 2001-0618 (La. App. 3 Cir. 11/7/01), 799 So.2d 1263, 1267 ("To establish the existence of a partnership without a written agreement, [the plaintiff] bears the burden of proof."). Louisiana's courts have specifically rejected joint ventures premised merely on parties' longstanding personal relationships. *Smith v. Lonzo*, 2002-1053 (La. App. 3 Cir. 2/5/03), 838 So.2d 918, 921; *see also Evertson v. Cannon*, 411 N.W.2d 612, 625-26 (Neb. 1987) (rejecting the argument that "the close relationship between" two individuals "created an implied joint venture" between them). The state's courts have also been unwilling to recognize contract formation—a key requirement of any joint venture—where the "only evidence of [an] agreement" was, like here, the "self-serving testimony" of one of the parties. *Villars v. Edwards*, 412 So.2d 122, 124-25 (La. Ct. App. 1982).

Parties in partnerships or joint ventures that pursue specific goals like developing a luxury home or an office building are not partners or joint venturers in subsequent projects

without a separate agreement to pursue the subsequent projects. *See K St. Developers, LLC v. Teachers Ins. & Annuity Ass'n of Am.*, 69 F. Supp. 3d 45, 52 (D.D.C. 2014) (rejecting plaintiff's contention that the parties formed an "overarching joint venture" to develop the second phase of a real estate project despite the existence of an agreement between the parties to jointly develop the first phase of the project); *Rankin v. Naftalis*, 558 S.W.2d 940, 946 (Tex. 1977) ("Evidence of a joint operating arrangement to develop a particular [oil] lease will not support a finding of a broader relationship."). Indeed, a partner in a partnership is not required to account to his partners for profits earned from "business enterprises unrelated to the partnership venture." *James v. Fabrikant*, 162 N.Y.S.2d 215, 217 (N.Y. App. Div. 1957). Thus, the mere fact that Hall participated in three independent real estate projects with Habul or Habul's companies does not prove the existence of an "overall joint venture."

Hall's "overall joint venture" argument also fails as a matter of law because the venture's scope, as Hall defines it, is too vague under Louisiana law.[3] As the cases Hall cites in her Proposed Findings of Fact and Conclusions of Law ("Hall's Proposed Facts and Conclusions") recognize, one critical element of any Louisiana joint venture is the formation of a contract between the parties. *White Haul Transp., Inc. v. Coastal Bridge Co.*, Civ. A. No. 06-11260, 2008 WL 2308858, at *4 (E.D. La. June 3, 2008) (citing *Cajun Elec. Power Co-Op, Inc. v. McNamara*, 452 So.2d 212, 215-16 (La. Ct. App. 1984)). An essential requirement of contract formation is "that the nature and extent of the obligations therein be certain." *Villars v. Edwards*, 412 So.2d 122, 124 (La. Ct. App. 1982); *see also White Hall Transp.*, 2008 WL 2308858, at *2 (explaining that a joint venture under Louisiana law is a vehicle for "carry[ing] ou[t] a single

---

[3] Although, as Habul argues, Australian law applies to the two Australian projects, Hall contends that her illusory "overall joint venture" is governed by Louisiana law. (Hall's Opp. to Habul's Mot. for Sum. J. at 4-5.) Solely for responding to Hall's argument and without conceding applicability of Louisiana law to any supposed joint venture between Hall and Habul, Habul applies Louisiana law here to rebut Hall's arguments.

business venture"). According to Hall, the "overall joint venture" with Habul involved not only the three specific projects, but also all of Habul's "ideas" and undertakings during a 10-year period whether or not she contributed funds or labor to the particular projects. (*See* Hall's Opp. to Habul's Mot. for Sum. J. at 15 (arguing that the "overall joint venture" was "not limited to a specific project" and included a number of projects).) As she puts it, she and Habul "were partners and friends and as things developed, we would be jointly partnered in any venture that come up that was developed by Kenny." (Hall Dep. at 37.) This claim of a vague and unbounded "overall joint venture" fails for lack of a certain object.

*White Properties, Inc. v. LoCoco*, 377 So.2d 474 (La. Ct. App. 1979), is instructive. In that case, the plaintiffs (a real estate company and home builders) sued the LoCocos, husband and wife, when the LoCocos reneged on an agreement to purchase a home that plaintiffs would design and build based upon the LoCocos' "ideas and needs." The trial court granted judgment for the plaintiffs, but the Court of Appeals reversed. According to the Court of Appeals, the purported contract between the parties was "invalid because it lacked a certain object." *Id.* at 476. The fatal "problem," the Court explained, was that the LoCocos' "ideas and needs" were such "vague and nebulous" concepts that "they never could be captured." *Id.* at 476. Hall's imagined "overall joint venture" with Habul suffers this same fatal flaw. Hall claims she and Habul agreed that she would provide financing for his unformulated and unconceived "ideas," which under *White Properties* is no contract at all.

Yet even if this Court were to find Hall and Habul had a "certain object" in pursuing Habul's "ideas," Hall's concept of an "overall joint venture" also suffers the independent flaw of being an invalid "agreement to agree." When parties leave open material terms of a supposed agreement, meaning they need the consent of another party to act, they have made an agreement

to agree. *See Pogo Producing Co. v. Shell Offshore, Inc.*, 898 F.2d 1064, 1068 (5th Cir. 1990). Hall admits that when Habul independently conceived of the Sanctuary Cove 1 Project, the Sanctuary Cove 2 Project, and the Cornelius Project, he contacted her on each occasion to ask if she would participate in the new developments. (Hall Aff. ¶ 6 (Sanctuary Cove 1); *id.* ¶ 16 (Sanctuary Cove 2); *id.* ¶ 18 (Cornelius).) The projects also took different organizational forms and involved different ownership interests. Given that Hall's consent was required for each project and that the terms changed across the projects, any "overall joint venture" between the parties could only have been an agreement to agree about participating in new projects in the future—an unenforceable contract under Louisiana law. *EPCO Carbondioxide Prods., Inc. v. Bank One, N.A.*, Civ. A. No. 04-2324, 2007 WL 1347785, at *6 n.11 (W.D. La. May 8, 2007) ("An 'agreement to agree' without all terms and conditions included is not enforceable under . . . general Louisiana contract law."); *McNeely v. Town of Vidalia*, 102 So. 422, 423 (La. 1924) ("[A]n agreement to agree is no agreement at all.").

In sum, the evidence developed in discovery and that will be proven at trial, along with the applicable law, establishes there was no all-encompassing joint venture between Hall and Habul. Because the Court has indicated that Hall's right to an accounting depends on such an "overall joint venture," her demand for an accounting should be denied on that basis alone.

**B.    *Even if Hall and Habul Formed an "Overall Joint Venture," Legal and Equitable Barriers Still Prevent the Accounting Hall Seeks.***

Even if Hall and Habul had formed an "overall joint venture," Hall is not entitled to the accounting she seeks. Louisiana law provides that a partner's duty to account is triggered when the partner breaches a fiduciary duty to his partners—something Hall acknowledges she cannot prove despite over two years of discovery. (Hall Dep. at 312-14.)

In her Complaint and Proposed Facts and Conclusions, Hall alleges that her claimed right

to an accounting arises from the supposed fiduciary duties Habul owes to her as her partner in the alleged "overall joint venture." (Compl. ¶ 17; Hall's Proposed Conclusions ¶¶ 3-5.) In making this argument, Hall overlooks the critical fact that the Louisiana Civil Code requires partners to account to one another only when a partner has violated a fiduciary duty to his other partners. Indeed, Article 2809 specifically provides:

> A partner owes a fiduciary duty to the partnership and to his partners. He may not conduct any activity, for himself or on behalf of a third person, that is contrary to his fiduciary duty and is prejudicial to the partnership. *If he does so*, he must account to the partnership and to his partners for the resulting profits.

La. Civ. Code art. 2809 (emphasis added). The official comments to Article 2809 make clear that the duty to account is triggered "[i]f a partner engages in an activity *in breach* of his fiduciary duty." *Id.* cmt. (c) (emphasis added); *Quinn-L Corp. v. Elkins*, 519 So.2d 1164, 1171 (La. Ct. App. 1987) (explaining that in resolving a dispute between partners under article 2809, the court had to determine "whether the [general partner] committed any acts which breached its fiduciary responsibility to the Partnership or the other partners"); *see also La Varre v. Hall*, 42 F.2d 65, 67 (5th Cir. 1930) ("[W]here there is a partnership or joint venture agreement, the remedy for a breach is for a dissolution and settlement of the partnership affairs and an accounting.").

The unequivocal language in Article 2809 making a breach of a fiduciary duty a necessary precondition of any accounting is absolutely fatal to Hall's claim. Throughout this litigation, Hall has acknowledged that she has no evidence that Habul breached any duty owed to her—despite the exchange of thousands of pages of discovery and over two years of litigation. (Hall Dep. at 312-14.) Absent a showing of breach, Hall's accounting claim fails under Louisiana law.

Hall's attempt to save her accounting claim by citing to Louisiana Civil Code article 3003—the article governing accountings required of "mandataries"—is equally unavailing. In

fact, her reliance on article 3003 conflates the law of partnership and joint ventures with the law of mandataries. In Louisiana, a mandatary is a person who is under contract to "transact one or more affairs for [a] principal." La. Civ. Code art. 2989. Because a mandatary is different from a partner, Louisiana case law makes clear that different inquiries are required to determine whether an individual is a partner or a mandatary, *Scheffler v. Adams & Reese, LLP*, 2006-1774, pp. 8-9 (La. 2/22/07), 950 So.2d 641, 648-49, and the existence of one does not establish the other, *Ross v. Digioia*, Civ. A. No. 11-1827, 2012 WL 5877843, at *6-7 (E.D. La. Nov. 20, 2012) (concluding that an individual acting as a mandatary was not the principal's partner). Thus, even if she can demonstrate the existence of an "overall joint venture," Hall cannot make Habul account as a partner absent a showing he breached a duty.[4]

## C.    When Analyzed Separately, Legal and Equitable Principles Prevent Hall from Obtaining an Accounting for Each of the Three Independent Real Estate Projects.

### 1.    Hall is not entitled to an accounting for the Sanctuary Cove 1 Project.

Hall has no legal basis to belatedly demand an accounting for the Sanctuary Cove 1 Project. The statute of limitations has long since run on the project, and Habul, who was not Hall's partner for the project, has no fiduciary duty to provide an account.

#### i.    Australia's six-year statute of limitations bars Hall's accounting claim for her contributions to the Sanctuary Cove 1 Project.

Federal courts sitting in diversity apply the law of the forum state to determine what law governs disputed claims. *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 704 (5th Cir. 1999). Under Louisiana's conflict-of-law rules, parties to a contract may "select the law that will determine the outcome of disputes arising from a contract." *Verdine v. Ensco Offshore Co.*,

---

[4] If Hall contends that the Power of Attorney that she executed on October 18, 2002 makes Habul her mandatary with respect to the Australian projects, *see* Hall's Proposed Findings ¶ 14, Habul has already provided a sufficient accounting. As discussed in other portions of this Trial Brief and in Habul's prior pleadings, PKF provided an accounting for the Sanctuary Cove 1 Project and WMS provided an accounting for the Sanctuary Cove 2 Project as Hall agreed was appropriate at the outset of the projects.

255 F.3d 246, 250 (5th Cir. 2001). Here, the JV Agreement that Hall's attorney drafted, that Hall signed, and which controls the arrangement to develop the Sanctuary Cove 1 Project provides that the project is to be governed by the law of Queensland, Australia. (Hall Dep. Ex. 1, § 16.1.)[5]

Australia applies a six-year statute of limitations to actions for an accounting. *See* Limitations of Actions Act of 1974, Pt. 2, § 10(2) (Docket # 59-3). As Hall concedes, the Sanctuary Cove 1 Project sold in February 2005. (Hall Dep. at 110-12.) Hall chose to reinvest her proceeds from the venture into the Sanctuary Cove 2 Project shortly thereafter (Hall Aff. ¶ 16, 17), and Hall never suggested to Habul she needed additional information about the project until many years later. (Habul Aff. ¶ 17; Hall Dep. at 124.) Hall's right to an accounting for the Sanctuary Cove 1 Project—to the extent one existed at all—expired in February 2011, over two years before Hall filed her petition for an accounting on April 23, 2013. Therefore, Australia's six-year statute of limitations bars Hall from obtaining an accounting for her contributions to the Sanctuary Cove 1 Project.

>    ii.    *Habul does not owe Hall a fiduciary duty to account because Group Three Australia, not Habul, was Hall's partner in the Sanctuary Cove 1 Project.*

Hall's accounting claim for her contributions to the Sanctuary Cove 1 Project also fails because Hall's contributions to the project were to Group Three Australia—not Habul personally. Parties to a partnership or joint venture must agree to be bound by the terms of the

---

[5] Hall attempts to avoid her clear selection of Australian law, but this argument is without merit. Louisiana Civil Code Article 3537 provides that courts deciding whether to honor a contractual choice-of-law provision should consider several factors with the ultimate inquiry being whether public policy requires application of different law than that selected by the contracting parties. Here, Australia's policy interests in the Sanctuary Cove 1 Project clearly outweigh those of Louisiana. While Hall and Habul discussed the Sanctuary Cove 1 Project in Louisiana, the undisputed purpose of the project was to develop property in Australia. Hall established bank accounts in Australia and negotiated loans with Australian banks. She hired Australian attorneys and accountants. She purchased the property for the project in her own name. Hall even admits that she visited Australia on multiple occasions to inspect the progress on the luxury home. Australia's policy interests in regulating disputes related to contracts affecting Australian real property and Australian corporations and performed in Australia outweigh Louisiana's minimal interest in applying its law to a foreign agreement discussed by a Louisiana citizen in Louisiana—especially when the Louisiana citizen traveled to Australia on multiple occasions to carry out her duties under the contract. Louisiana law, therefore, would honor Hall and Habul's preference for Australian law to govern the Sanctuary Cove 1 Project.

partnership or joint venture. *White Haul Transp., Inc. v. Coastal Bridge Company, LLC*, No. 06-1126, 2008 WL 2308858, at *4 (E.D. La. June 3, 2008); *see also Highground, Inc. v. Alonzo*, Civ. A. Nos. 12-1815, 12-2642, 2013 WL 499246, at *6 (E.D. La. Feb. 17, 2013) (holding that individuals who had not agreed to form a partnership were not partners despite their participation in common "business endeavors" organized "through corporations and limited liability companies"). In this case, Group Three Australia was Hall's counter-party in the Sanctuary Cove 1 Project, and their agreement specified that the business arrangement between them did not constitute a partnership. (Hall Dep. at 59, 64-68; Hall Dep. Ex. 1, § 11.1.) Habul was not a party to the agreement. As a result, Habul owes no fiduciary obligation to account to Hall for funds associated with the Sanctuary Cove 1 Project.

Hall also has no legal or factual basis to hold Habul responsible for the actions of Group Three Australia—a properly formed and separately managed Australian corporation. *See, e.g.*, *CheckPoint Fluidic Sys. Int'l, Ltd. v. Guiccione*, Civ. A. No. 10-4505, 2011 WL 3268386, at *4 (E.D. La. July 28, 2011) (dismissing defendant's accounting counterclaim against non-parties to a lawsuit where defendants failed "to assert a plausible factual basis to disregard the separate legal status of [a partnership], [limited liability company], and the individual . . . and to treat all of the parties as one entity for purposes of this litigation"). The agreement specifically governing the Sanctuary Cove 1 Project states that Hall and her joint venture partner owe no duties to one another as partners and that a third party will provide an accounting. Australian law permits parties to joint venture agreements to negotiate around many fiduciary duties, *News Ltd. v. Australian Rugby Football League Ltd.* [1996] FCA 870 ("[I]n a relationship constituted by contract, the nature of the fiduciary obligations owed by the parties—and indeed whether there are any fiduciary obligations at all—may be determined by the terms of the parties' agreement.")

(Docket # 59-7), and the parties did so here by selecting PKF Accountants to provide the project's accounting.

Because the statute of limitations on Hall's accounting claim for her contributions to the Sanctuary Cove 1 Project has long since run; because Hall's contributions to the Sanctuary Cove 1 Project were to Group Three Australia; and because she agreed that PKF Accountants would provide an accounting of the joint venture's profit and losses, Habul owes Hall no fiduciary duty to provide any further accounting of her contributions to the project.

    **2.**    ***Hall is Not Entitled to an Accounting for the Sanctuary Cove 2 Project.***

        *i.*    *Australian corporate law, which governs claims arising out of disputes between the shareholders in Louisiana Developments, prevents Hall from obtaining an accounting from Habul.*

Habul also does not owe Hall a duty to account for any funds associated with the Sanctuary Cove 2 Project. Hall admits she and Habul established an Australian corporation to develop the second luxury home at Sanctuary Cove. (Hall Dep. at 145-46; Hall Aff. ¶ 17.) This admission is fatal to her request for an accounting regarding her contributions to the Sanctuary Cove 2 Project because Australian corporate law imposes no duty on shareholders to account to one another.

Louisiana's choice-of-law rules provide that "the law of the place where the corporation was incorporated governs disputes regarding the relationship between the officers, directors, and shareholders and the officers' and directors' fiduciary duties." *Torch Liquidating Trust ex rel. Bridge Assocs. LLC v. Stockstill*, 561 F.3d 377, 385 n.7 (5th Cir. 2009). Hall and Habul each own 50% of Louisiana Developments, and this dispute centers on whether one 50% shareholder owes a duty to the other 50% shareholder to account. Yet under Australian law, "the relation between members of any company or association that is incorporated under the Corporation Act . . . is not a partnership within the meaning of the [Partnership Act]." Partnership Act, Ch.1, Pt.

2, § 5(2) (Docket # 59-4). Louisiana law (as recognized by a case Hall cites) provides likewise. *Ault v. Wiborg Co. of Canada v. Carson Carbon Co.*, 181 La. 681, 688, 160 So. 298, 300 (1935) ("[T]here is no joint adventure where . . . the business or enterprise is organized and operated in corporate form."); *see also Berke v. Hamby*, 719 N.Y.S.2d 280, 281 (N.Y. App. Div. 2001) ("[A]s a general rule, a partnership may not exist where the business is conducted in a corporate form, as each is governed by a separate body of law."). Habul, therefore, owes Hall no fiduciary obligations as a partner in the Sanctuary Cove 2 Project because he and Hall specifically elected to be shareholders in a corporation rather than "partners" or "joint venturers."

No other aspect of Australian corporate law would make Habul provide an accounting to his fellow shareholder. Hall has presented no evidence showing that Habul breached any duty as an officer or director of the company. And even if she had, the duties of officers and directors of an Australian corporation are owed to the *corporation*, not to individual shareholders. *See Fortron Automotive Treatments Pty Ltd. v. Jones & Ors (No. 3)*, [2011] FMCA 467 ("Sections 180, 181 and 182 [of the Australian Corporation Act] involve duties owed to the corporation.") (Docket # 59-8). Accordingly, Habul owes no fiduciary duty as a shareholder in Louisiana Developments to provide an accounting to a fellow shareholder like Hall.

> ii.   *Hall is also barred from obtaining an additional accounting for the Sanctuary Cove 2 Project because she has already received a full accounting of the project's profits and losses from WMS.*

Hall's demand for an accounting for the Sanctuary Cove 2 Project is also fatally undermined by the fact that she has already obtained a full accounting of the project's profits and losses. During the course of the development of the Sanctuary Cove 2 Project, Louisiana Developments, with Hall's knowledge and consent, retained WMS to perform accounting services for the project. Although Louisiana Developments initially lacked the funds to pay WMS to perform an accounting, Habul used personal funds to pay for the accounting in the

spring of 2015. WMS' professional accounting revealed that Hall owes $92,690 (AUD) to Louisiana Developments and Habul owes $22,913 (AUD) to the company. Hall's receipt of a full accounting of Louisiana Developments' profits and losses related to the Sanctuary Cove 2 Project forecloses any further demand for an accounting related to the project, *In re Huffman*, 505 B.R. 726, 758 (Bankr. S.D. Miss. 2014) (denying accounting claim where evidence submitted at trial "provided an adequate accounting of the monies" in dispute), particularly when the accounting demonstrates that Hall owes money to the corporation, *see Hernandez v. First Am. Loanstar Trustess Servs.*, No. 10cv00119 BTM(WVG), 2010 WL 1445192, at *5 (S.D. Cal. Apr. 12, 2010) ("Plaintiffs, as the party owing money, not the party owed money, has [sic] no right to seek an accounting.").

### 3. Granting Hall an Accounting for any of the Three Independent Real Estate Projects Would Also be Inequitable.

In addition to the legal barriers to Hall's accounting claim, her request for an accounting should be denied on the grounds that requiring Habul to perform an accounting for any of the three independent projects would be inequitable. An accounting is an equitable remedy. *Roberts v. Am. Bank & Trust Co.*, 835 F. Supp. 2d 183, 205 (E.D. La. 2011). In this case, the equitable factors weigh strongly against granting Hall's request for an accounting.

As an initial matter, the factual record developed in discovery demonstrates that Hall had—and has—equal access to the relevant information about the projects. Indeed, Hall agreed to manage the Sanctuary Cove 1 Project (Hall Dep. Ex. 1), and, in that capacity, received direct communications from the attorney overseeing the purchase and sale of the property (Hall Dep. at 95-98, 114-19, 121-23) and bank statements for the project's bank account (*id.* at 101-07). Likewise, Hall was a fifty percent owner of the Australian corporation established to pursue the Sanctuary Cove 2 Project, and she directly corresponded with the corporation's attorney (*id.* at

151-55, 163-67), received critical information about the purchase and sale of the property (Hall Dep. Exs. 18-20, 25-27), and had access to the corporation's bank statements (Hall Dep. at 224). For the Cornelius Project, meanwhile, Hall established a bank account to make contributions to the project (Hall Aff. ¶¶ 28, 32) and met with an accountant to help her and Habul sort through the project's finances (Hall Dep. at 262-64).

As this Court has recognized, an accounting "'is a species of compulsory disclosure, predicated upon the assumption that the party seeking relief does not have the means to determine how much—or, in fact, whether—any money properly his is being held by another.'" *Hall v. Habul*, Civ. A. No. 13-406-SDD-RLB, 2014 WL 2441177, at *3 (M.D. La. May 30, 2014) (quoting *Rosenak v. Poller*, 290 F.2d 748, 750 (D.C. Cir. 1961)). The evidence in the record and which will be proven at trial demonstrates that Hall has the means to determine whether Habul owes her money. That Hall made a deliberate "choice" to not take advantage of this detailed information (Hall Dep. at 143) and never asked Habul or the other professionals for additional information about these projects (*id.* at 123-25 (Sanctuary Cove 1); *id* at 201-02, 210-11, 216-17, 223, 225 (Sanctuary Cove 2); *id.* at 264 (Cornelius)) does not absolve her of the responsibility of proving her alleged damages through the discovery process rather than an accounting claim. *See First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985) (denying an accounting where the party seeking the accounting had "made no showing why its claims for monies owed could not be identified as damages under its breach of contract claim").

Hall's request for an accounting is also inequitable because accountants, which were hired with the knowledge and consent of Hall, have already reviewed the financial records of the three projects. Hall acknowledges that PKF Accountants and WMS were retained to provide

accounting services for the two Australian projects. (Hall Dep. at 77-79 (Sanctuary Cove 1); *id.* at 149-50 (Sanctuary Cove 2).) In addition, Hall, Habul, and Habul's wife specifically met with an accountant in North Carolina to straighten out their finances and to review Hall's "capital investments" in the Cornelius Project. (*Id.* at 262-64; Hall Dep. Ex. 37.) Courts routinely reject accounting claims where the evidence reveals that the parties accounted to one another during the period of their agreement and have acquiesced to the correctness of their accounts by "failing to object within a reasonable time." *See e.g., First Commodity Traders,* 766 F.2d at 1011. Hall, therefore, has already received and accepted any accounting to which she is entitled by failing to raise contemporaneous objections or questions about the accountants' work.

Another equitable factor weighing against Hall's demand for an accounting regarding the Sanctuary Cove 1 Project is that Hall has waited too long to request additional information. Equity bars an individual's right to an accounting when she neglects to promptly assert her rights. *See Elias v. Elias*, 237 A.2d 215, 217 (Pa. 1968). The Sanctuary Cove 1 Project was sold and finalized in 2005, and Hall admits that she never raised any questions about the project to Habul or her Australian attorney until she prepared to initiate this action. (Hall Dep. at 123-24; Habul Aff. ¶ 17) and the Australian accountants had already destroyed the relevant records (Habul Aff. ¶ 53). Requiring Habul to account for a long-finalized project when the accountants responsible for determining the project's profits or losses have destroyed their records would be grossly unfair.

Finally, Hall's requested accounting would be inequitable with respect to the Cornelius Project because the evidence developed in discovery and that will be proven at trial reveals that Hall's contributions to the project were used as intended. Hall identifies two types of contributions she made to the Cornelius Project. First, she allowed Habul to use $311,000 in

proceeds from the Second Cornelius Loan to purchase the Second Cornelius Parcel. There is no dispute that Habul used the money for that purpose. In fact Group Three NC continues to own the Second Cornelius Parcel for the benefit of the Cornelius Project. Second, Hall made payments totaling $222,374 to pay down the First Cornelius Loan and the Second Cornelius Loan. Those contributions, too, were used for Hall's intended purpose—a point underscored by the fact that Habul ultimately used personal funds to settle the First and Second Cornelius Loans so that neither Hall nor Habul has any obligation under either loan. As a result, equity does not permit the accounting for the Cornelius Project that Hall seeks. *See In re Huffman*, 505 B.R. at 758 (denying accounting claim where evidence submitted at trial "provided an adequate accounting of the monies" in dispute); *Flores v. EMC Mortg. Co.*, 997 F. Supp. 2d 1088, 1120 (E.D. Cal. 2014) ("A suit for an accounting will not lie where it appears from the complaint that none is necessary.").

### D.    *Hall has no Right to an Accounting for Her Personal Loans to Habul.*

Habul also owes no duty to account for funds that Hall acknowledges were interest-free personal loans to Habul. Hall does not—and cannot—dispute that to obtain an accounting, she must demonstrate that Habul received the funds in a fiduciary capacity. *Hodson v. Hodson*, 292 So.2d 831, 835 (La. Ct. App. 1974) (explaining that to be entitled to an accounting, the party seeking the accounting must establish that the "fiduciary received the funds or property and the amount or quality thereof"). Because she cannot show that Habul received these personal loans in a fiduciary capacity, Hall's request for an accounting fails.

Hall's factual allegations and sworn testimony demonstrate that she did not make the alleged personal loans in furtherance of her business ventures with Habul. (*See, e.g.*, Complaint ¶¶ 12; Hall Aff. ¶ 22, 23, 37.) It is well settled that debtors and creditors do not owe fiduciary duties to one another. *See Trans-Global Alloy Ltd. v. First Nat'l Bank of Jefferson Parish*, 583

So.2d 443, 452 (La. 1991) (explaining that the debtor-creditor relationship does not impose duties of care). A "mere creditor has no right to compel his or her debtor to account in equity, in the absence of any trust relation between them." 1 Am. Jur. 2d *Accounts and Accounting* § 55. Thus, Hall cannot require Habul to account for personal loans she made to him.

In addition, an accounting of the personal loans is unnecessary. Hall is the person with access to the relevant information about any such loans. As the alleged lender, she has the records related to the "amounts and timing" of any loans she believes she made to Habul and, presumably, has kept track of what she believes Habul owes to her. *Centrix HR, LLC v. On-Site Staff Mgmt., Inc.*, Civ. A. No. 04-5660, 2008 WL 2265266, at *12 (E.D. Pa. June 3, 2007) (explaining that an accounting "is not a substitute for plaintiffs' obligation to establish [her] damages through discovery" (internal quotation marks omitted)), *aff'd in relevant part*, 349 F. App'x 769 (3d Cir. 2009). Evidence developed in discovery also demonstrates that Habul has paid Hall $337,100 to repay the personal loans—$17,100 more than the $320,000 that she contends she loaned to him. Hall has no basis for seeking an accounting for any personal loans she made to Habul. *Whitney Nat'l Bank v. Zewe*, 619 So.2d 729, 732 (La. Ct. App. 1993) (holding that a guarantor's obligation was extinguished by "payment of the total sum which he obligated himself to pay").

## CONCLUSION

Throughout this lawsuit, Hall has attempted to paint Habul as an irresponsible business man who abused his friendship with her to fund his real estate projects and stonewall her efforts to obtain more information. The facts developed in discovery and that will be proven at trial, however, undermine Hall's accounting claim. Hall has always had equal access to the financial records for all three independent projects. And both Hall and Habul have produced in discovery over one thousand pages of materials that document in detail the three real estate projects. These

materials establish that each dollar Hall contributed to the three projects was used as intended, and Hall admits she has no evidence that Habul has breached any fiduciary duty. Moreover, Habul has used personal funds to pay WMS to perform a full accounting for the Sanctuary Cove 2 Project; has used his own money to save Hall's property securing the Cornelius Project from foreclosure; and has readily acknowledged that Hall owns an unencumbered interest in 20% of the Cornelius Project's land.

Against this backdrop of transparent and fair treatment, Hall persists in her demand for an accounting. But despite the thorough exchange of relevant discovery materials—or, more accurately, *because* of those materials—Hall still cannot identify what projects are a part of her alleged venture in Habul's "ideas." (*See* Hall's Proposed Findings ¶ 8.) Nor can she articulate a legal basis under Louisiana law for the accounting she seeks.[6] *See* Hall's Proposed Conclusions ¶ 11.

The facts, the law, and equitable principles dictate that Habul, Hall, and this Court be spared the expense of the unbounded and unwarranted accounting that Hall seeks. For the reasons discussed herein, therefore, Habul respectfully requests that the Court deny Hall's claim for an accounting.

---

[6] If the Court elects to award any form of an accounting to Hall, Habul asks that the Court follow the practice of the only case Hall cites to support the procedure for the accounting she demands. The case, *Burning Foot, Ltd. v. Hoover*, 499 So.2d 1, 1-2 (Fla. Dist. Ct. App. 1986), provides that the costs of the accounting should be apportioned equally between Hall and Habul—at least until it is shown that "the justice of the case requires" a different division.

Respectfully submitted this 21st day of August 2015.

/s/ Douglas M. Jarrell
Douglas M. Jarrell
djarrell@rbh.com

Heyward H. Bouknight
hbouknight@rbh.com

**Robinson, Bradshaw & Hinson, P.A.**
101 North Tryon Street, Suite 1900
Charlotte, NC 28246-1900
Telephone:    704-377-2546
Facsimile:    704-378-4000
*Admitted pro hac vice*

/s/ Michael W. McKay
Michael W. McKay
mmckay@stonepigman.com

**Stone Pigman Walther Wittman LLC**
One American Place, Suite 1150
310 Main Street
Baton Rouge, Louisiana 70825
Telephone:    225-490-5811
Facsimile:    225-490-5860

*Attorneys for Defendant Kenny Habul*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was electronically filed today with the Clerk of the Court using the CM/ECF system. Notice of the filing will be sent to all counsel of record through operation of the Court's electronic filing system as follows:

> Van R. Mayhall, Jr.
> Jude C. Bursavich
> Sunny West
> Claude F. Reynaud, III
> Breazeale, Sachse & Wilson, LLP
> 301 Main Street, Suite 2300
> P.O. Box 3197
> Baton Rouge, Louisiana 70821-3197

This 21st day of August 2015.

/s/ Douglas M. Jarrell
Douglas M. Jarrell
